**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

FAMILY FIRST LIFE, LLC,

                Plaintiff,

   v.

DAVID RUTSTEIN, a/k/a DAVID GORDON
a/k/a BOB GORDON, a/k/a NATE GOLDEN;      Case No. 9:22-cv-80243-AMC
MINDY RUTSTEIN; ERIC SAVAGE; and the
NATIONAL ASSOCIATION OF ACCREDITED
INSURANCE PROFESSIONALS

                Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Family First Life, LLC (FFL) brings this action to stop Defendants David Rutstein, Mindy Rutstein, Eric Savage, and the National Association of Accredited Insurance Professionals (NAAIP), from continuing their campaign of unlawful and unfair competition, tortious interference, harassment, and disparagement against FFL and its independent insurance agents (Agents).  FFL alleges as follows:

### THE PARTIES

1.     Plaintiff FFL is a Delaware limited liability company with its principal place of business in Uncasville, Connecticut.  Its network of Agents operates nationwide.

2.     Defendant David Rutstein has several aliases including (but not limited to) David Gordon, Bob Gordon, Mindy Rutstein, and Nate Golden.  Mr. Rutstein resides in Jerusalem, Israel, but at times (including times material to the allegations stated herein) has purported to live in Boca Raton, Florida.  Mr. Rutstein's LinkedIn page lists NAAIP in Boca Raton, Florida as his place of

employment.  Mr. Rutstein has contacted FFL Agents from the phone number 561-440-9245, which has a Palm Beach, Florida area code.

3.      Defendant David Rutstein is the owner and operator of Defendant NAAIP.  NAAIP is not incorporated and is an alter ego of David Rutstein's.  NAAIP's social media accounts have listed both Jerusalem, Israel and Boca Raton, Florida as its headquarters.  The contact number listed on NAAIP's Facebook page is 561-440-9245, which is a Palm Beach, Florida area code.  A sample website for "David Gordon" on NAAIP's website lists Boca Raton, Florida as "Mr. Gordon's" location.

4.      Defendant Eric Savage is a licensed insurance agent in the State of Florida.  Mr. Savage resides in Boca Raton, Florida.  At times (including times material to the allegations stated herein) Mr. Savage has allowed Mr. Rutstein to use his name in insurance contracting paperwork that he sends to Agents.  FFL has recently learned that Mr. Savage's name was listed on insurance contracting paperwork that Mr. Rutstein sent to an Agent.

5.      On information and belief, Defendant Mindy Rutstein resides in Jerusalem, Israel and/or in Boca Raton, Florida.  Ms. Rutstein's LinkedIn profile lists her location as Boca Raton, Florida.  At times, Ms. Rutstein has actively participated in the operations of NAAIP, including posting a video of herself singing to NAAIP agents.  On information and belief, Ms. Rutstein is still actively involved in NAAIP and/or otherwise allows Mr. Rutstein and NAAIP to use her name, image, and likeness to operate NAAIP (either with or without her knowledge).

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1367, and 15 U.S.C. § 1121.  FFL's Lanham Act claims give rise to jurisdiction under 28 U.S.C. § 1331 and, independently, under 15 U.S.C. § 1121.  This Court independently has jurisdiction to consider the state law claims under 28 U.S.C. § 1367.  The state claims are "so

related to" the Lanham Act claim "that they form part of the same case or controversy under Article III of the United States Constitution."   28 U.S.C. § 1367(a).   All the claims are based on Defendants' unfair and deceptive practices in the insurance industry, and how Defendants' conduct has injured FFL.   Moreover, none of the state law claims (1) "raises novel or complex issue[s] of State law," or (2) "substantially predominates" over the Lanham Act claim.   *See* 28 U.S.C. § 1367(c).

7.      Defendants are subject to specific personal jurisdiction in Florida under Florida's long-arm statute, § 48.193(1)(a)(2), Fla. Stat.   Defendants personally or through an agent committed tortious acts within Florida such as tortious interference with business relationships, unfair competition and deceptive trade practices, libel, and defamation, and the Defendants' contacts with Florida are sufficient to satisfy the Due Process Clause.   The claims herein arise from this tortious activity.   Alternatively, Defendants are subject to general jurisdiction in Florida because Defendants are engaged in substantial activity in Florida.   *Id.* § 48.193(1)(b)(2). Defendants have maintained continuous and systemic contacts with Florida irrespective of the claims asserted herein.

8.      Venue is proper in this District under 28 U.S.C. § 1391.   Parts of the events giving rise to these claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

### **GENERAL ALLEGATIONS**

### A.      **Independent Marketing Organizations & FFL**

9.      This case concerns unlawful and unfair competition involving the insurance industry and one of its most common features: independent marketing organizations (IMO).

10.      An IMO does not underwrite or issue insurance policies; rather it acts as a liaison between independent contractor insurance agents (Agents) and insurance carriers.

3

11.     Agents do not have the resources or connections that IMOs do; and insurance carriers prefer to work directly with IMOs than issue carrier appointments to individual Agents.

12.     IMOs offer resources including, but not limited to, training, marketing, leads, contracting, and recruiting to Agents.

13.     "Leads" generally consist of contact information for individuals who have requested information about life insurance online or via mail.  In FFL's case, agents may purchase leads from lead vendors (unaffiliated with FFL) to schedule appointments with potential customers.

14.     The resources IMOs provide allow the Agents to issue insurance policies and to build their own agencies and businesses.  As is common in the IMO industry, many of the Agents that affiliate with an IMO form their own companies and recruit other Agents.  The IMO serves as an "upline" to the Agents that affiliate with it.  If an Agent recruits another Agent, the recruit becomes part of the IMO's and the recruiting Agent's "downline."  Downline Agents are generally Agents with less experience or possibly a smaller team and may have a lower contract rate through the third-party insurance carriers.

15.     This "upline/downline" model is common in the insurance industry because it offers several benefits including, for example, the ease of contracting with carriers, access to more carriers, and greater choices in coverage.

16.     Carriers pay a commission to an Agent for a policy he/she sells. These commissions are typically a percentage of the annual premium expected to be paid over the first year of the policy period.  The customer pays the premium according to a fee schedule, but the Agent gets paid a commission based on the total annual premium amount assigned to that policy.  Essentially,

4

the commission is akin to an advance commission, with the assumption that the customer will maintain coverage and continue making premium payments throughout the policy term.

17.     Uplines also receive a "override commission" when a downline Agent sells a policy. When an Agent sells an insurance policy to a customer, the insurance carrier pays a commission to the writing Agent and an "override commission" to any Agent in his/her upline including the IMO.

18.     In exchange for override commissions, the IMO assumes significant financial risk. The IMO acts as the ultimate guarantor of any debt the Agent may incur related to "chargebacks." A chargeback occurs when an Agent loses a portion of his or her commission for a sale as a result of the customer terminating a policy early.  If a customer cancels their policy early, the Agent and his/her uplines are responsible for reimbursing the carrier for the difference between the commission s/he received and the commission to which s/he is actually entitled in light of the premiums that were paid to the carrier before the cancellation.

19.     As the guarantor of the debt, the IMO is ultimately responsible for the "chargebacks," which it assumes when people in the downline default.  If the Agent defaults, the chargeback will roll its way up that Agent's chain of uplines, until it is rolled up to the IMO.

20.     The IMO has every incentive to pay back the debt to maintain its relationship with the carrier.  An IMO's relationships with the insurance carriers are pivotal to an IMO's business.

21.     An Agent does not have the same incentive structure.  If an Agent terminates his/her relationship with an IMO to work with a different IMO that contracts with different carriers, the Agent has little incentive to pay his/her chargeback debt.

22.     IMOs and Agents use a number of marketing tools (including social media platforms) to engage with other industry professionals and to encourage them to consider affiliating with the IMO and/or its Agents.

23.     FFL is an IMO that follows this model.

24.     Because FFL does not underwrite any insurance directly, its relationships with the insurance carriers, vendors, and prospective and current Agents are crucial to its business. Likewise, its reputation in the insurance industry is instrumental for it to maintain strong business relationships with its insurance carriers and Agents.

25.     Like other IMOs and their Agents, FFL and its Agents use social media platforms to encourage them to consider affiliating with FFL and/or its Agents.

26.     The most successful recruiting tools for FFL Agents include Facebook and LinkedIn.

**B.     David Rutstein & His Illegal NAAIP Business**

27.     David Rutstein is a formerly licensed insurance agent who is running an illegal IMO called NAAIP.

28.     At one time, Mr. Rutstein held insurance licenses in 40 different states, including in Florida.  But starting in 2010, insurance regulators began terminating or refusing to renew Mr. Rutstein's licenses.

29.     On February 14, 2012, Florida's Department of Financial Services issued an Administrative Complaint alleging that Mr. Rutstein aided or represented an unauthorized insurer

in transactions and that he misappropriated approximately $200,000 in consumer funds in the form of commissions received for nonexistent insurance products.[1]

30.     On April 19, 2012, Mr. Rutstein agreed and stipulated to a Consent Order (Case No. 115256-11-AG) to resolve these allegations.  The Consent Order revoked his Florida insurance license, immediately and permanently removed and banned him from any and all direct or indirect participation in and/or affiliation with any entity which is licensed or regulated under the Florida Insurance Code, or "any individual or entity which is otherwise involved in the business or transaction of insurance."[2]

31.     In 2010, prior to the Consent Order barring Mr. Rutstein from involvement in the business of insurance, he founded NAAIP and held himself out in the industry business as NAAIP.

32.     The Consent Order explicitly barred Mr. Rutstein from continuing his affiliation with NAAIP and/or from further engagement with the insurance business.  Nevertheless, Mr. Rutstein still owns and operates NAAIP, albeit under a variety of false names.

33.     Five years after the Consent Order was entered, NAAIP and Mr. Rutstein were the subject of a trade secrets case brought by Compulife Software, Inc., a business that provides life insurance quotes.

34.     The *Compulife* case was tried in front of Magistrate Judge Hopkins of the Southern District of Florida from October 3–6, 2017.[3]  After a bench trial, the Magistrate Judge found that Mr. Rutstein willfully and maliciously stole Compulife's trade secrets and used it in his insurance

---

[1] *See* Dkt. No. 4, Declaration of Drew Bell (Bell Decl.) ¶ 4; Ex. A (*In the Matter of David Brian Rutstein*, Case No. 115256-11-AG, Settlement Stipulation for Consent Order ("Consent Order")).

[2] *Id.* ¶ 9(c).

[3] *Compulife Software, Inc. v. Rutstein*, 2018 WL 11033483 (S.D. Fla. Mar. 12, 2018), *aff'd in part and vacated in part Compulife Software, Inc. v. Newman*, 959 F.3d 1288 (11th Cir. 2020).

work. *Compulife Software, Inc. v. Rutstein*, 2018 WL 11033483 (S.D. Fla. Mar. 12, 2018), *aff'd in part and vacated in part sub nom. Compulife Software, Inc. v. Newman*, 959 F.3d 1288 (11th Cir. 2020).[4]

35.     Judge Hopkins generated several findings illustrating that NAAIP and Mr. Rutstein are alter egos that are still "involved in the business or transaction of insurance." As Judge Hopkins found: (1) Mr. Rutstein and NAAIP are alter egos because NAAIP "is not a real entity, charity, not-for-profit, or trade association, and is not incorporated anywhere"; (2) Mr. Rutstein and NAAIP were involved in the insurance business from at least 2012 to 2017 in flagrant contravention of the Consent Order; (3) Mr. Rutstein lied at his deposition when he disclaimed involvement with NAAIP; and (4) Mr. Rutstein's son, Defendant Binyomin Rutstein, admitted that he authorized people to use his insurance licenses in connection with the operation and marketing of NAAIP to insurance agents.

36.     The Magistrate Judge further ordered Mr. Rutstein to immediately discontinue the provision of life insurance quoting and quotation services and the use of life insurance quoters on the websites at the domain names www.naaip.org and www.beyondquotes.com.

37.     In flagrant violation of Florida law, the Department of Financial Services' Consent Order and the Magistrate Judge's order, and under a variety of aliases, Mr. Rutstein still owns, operates, and promotes NAAIP; offers Agents his advice; and hocks insurance products.

38.     NAAIP now purports to have more than 14,000 registered members.

39.     On information and belief, NAAIP remains Mr. Rutstein's alter ego, and it is not a real entity, charity, not-for-profit, or trade association. Nor is it incorporated anywhere.

---

[4] While the Eleventh Circuit reversed some of the Magistrate's findings, it agreed with this assessment. See *Compulife*, 959 F.3d at 1297.

40.     Nevertheless, NAAIP still maintains a public website that purports to provide website templates to insurance Agents.

41.     Mr. Rutstein still uses the same NAAIP-hosted email address (david@naaip.com).

42.     In violation of Florida law and the Consent Order, NAAIP has also increased its offerings and now openly advertises itself as an IMO.[5]

43.     NAAIP's website states that Agents have "the option to sell insurance products with NAAIP as the upline."[6]

44.     NAAIP's YouTube page states that "NAAIP earns money by being an upline/FMO for multiple carriers and a lead provider."[7]

45.     In violation of the Consent Order and Florida law, FFL has discovered that Mr. Rutstein and NAAIP are specifically (1) soliciting FFL Agents, (2) encouraging them to get their clients to cancel FFL-issued contracts (which results in chargebacks that FFL Agents and ultimately FFL are responsible for), (3) encouraging or instructing Agents to sell NAAIP-endorsed contracts to their clients instead; and (4) threatening and harassing Agents for affiliating with FFL.

46.     In violation of the Consent Order and Florida law, FFL has learned that Mr. Rutstein and Mr. Savage have a long-standing relationship in which Mr. Runstein funnels new Agents and leads generated by NAAIP to Mr. Savage in exchange for commissions.

47.     On his video calls, on social media platforms, and in emails to Agents, Mr. Rutstein attempts to convince Agents to sell NAAIP-endorsed carrier policies and encourages them to tell their clients to cancel their FFL-issued policies.

---

[5] Dkt. No.4, Bell Decl. ¶ 5; Ex. B (Mindy post).

[6] https://www.naaip.org/

[7] https://www.youtube.com/c/NaaipOrg/about

48.     On information and belief, Mr. Savage enters into contracts with insurance carriers on behalf of the Agents Mr. Rutstein recruits, acts as the Agent's upline to receive override commissions, and then provides a kickback (at times 30% of the commission) to Mr. Rutstein.

49.     This scheme with Mr. Savage is an illegal attempt to evade the Consent Order and Florida law.

50.     Mr. Rutstein has also sent numerous emails to FFL agents, oftentimes riddled with false disparagement against FFL, and solicited them to listen to his calls and join NAAIP.   On information and belief, Mr. Rutstein has emailed thousands of agents messages that purport to compare opportunities offered by various carriers (including ones FFL contracts with).

51.     In emails and in videos, Mr. Rutstein has disparaged Americo products, which happen to be the policies issued by most FFL Agents.  By way of example only, Mr. Rutstein has advised agents in emails and on publicly posted videos that Americo, among other things, provides "[s]maller policies" than NAAIP-endorsed policies and "[s]everely over-priced products which are replaced with ease."[8]

52.     NAAIP's website also hosts a daily video conference that takes place from Monday to Thursday at noon and on the weekends at 2 pm ET.[9]  David Rutstein is always the presenter.  He spends the conference giving bad advice to insurance Agents, aggressively pushing insurance products, and disparaging other IMOs, especially FFL.

---

[8] *See* NAAIP, *NAAIP vs New York Life vs Americo - Life Insurance Company Comparison for Agents*, YouTube (Nov. 13, 2021), https://www.youtube.com/watch?v=HJUjrLTizWY.

[9] *Id*.

53.     NAAIP also has numerous social media accounts, including on Facebook, YouTube, Twitter, and LinkedIn,[10] some of which state that that NAAIP "specializes in leads, selling systems and helping agents make money."[11]

54.     Mr. Rutstein's daughter, Mindy Rutstein, is purportedly an employee of NAAIP, according to her social media profiles.  However, it is possible that Mr. Rutstein is simply pretending to be his daughter on social media as another attempt to evade the Consent Order.

55.     Mindy Rutstein or someone with the handle "Mindy Rutstein" uses several accounts on social media platforms to state that she is employed with NAAIP, albeit in different capacities.  A Facebook account associated with "Mindy Rutstein" formerly stated that she was "an Insurance Consultant at naaip.org"[12]  A LinkedIn account formerly listed "Mindy Rutstein" as a "Marketing Manager at NAAIP."[13]

56.     On information and belief, these accounts belong either to Mindy Rutstein or David Rutstein.  Mr. Rutstein routinely posts live videos of himself using the "Mindy Rutstein" Facebook account.

57.     Neither David Rutstein nor Mindy Rutstein has any sort of license to engage in any insurance-related activities in Florida.

**C.     Examples of Defendants' Unfair and Deceptive Business Practices**

58.     Defendants engage in several deceptive and unfair practices to attempt to recruit Agents away from FFL and to otherwise harm FFL.  These means involve at least (1) the daily

---

[10]https://www.youtube.com/c/NaaipOrg/channels;          https://twitter.com/naaipagents; https://twitter.com/naaiporg?lang=en;          https://www.linkedin.com/company/naaip.org/; https://www.facebook.com/naaip.org.

[11] Dkt. No. 4, Bell Decl. ¶ 6; Ex. C (https://www.facebook.com/groups/naaipagents).

[12] Dkt. No. 4, Bell Decl. ¶ 7; Ex. D (https://www.facebook.com/mindy.rutstein.50).

[13] Dkt. No. 4, Bell Decl. ¶ 8; Ex. E (https://www.linkedin.com/in/mindy-rutstein/).

video call disparaging FFL and the carriers that it contracts with (*supra* ¶¶ 47, 51–52, *infra* ¶¶ 59–60, 72); (2) aggressive, harassing, and threatening phone calls and emails to FFL's Agents (*infra* ¶¶ 61–64, 75–79); (3) an outrageous and deceptive scheme on social media in which Defendants—including, but not limited to, Mr. Rutstein and NAAIP—pretend to be different people by using aliases including "Mindy Rutstein" to spread lies about FFL (*supra* ¶¶ 54–56, *infra* ¶¶ 66–71); and (4) post fake online reviews (*infra* ¶ 74).

59.     Defendants spend a substantial amount of time on the NAAIP daily video call disparaging FFL.  In at least one of these videos, Mr. Rutstein rants about FFL and falsely claims: (1) FFL does not "offer the right contracts"; (2) new Agents join FFL to "become victims"; (3) FFL said "these new agents are so dumb we can lie to them and we can steal from them"; (4) FFL is "lying about a lot of stuff"; (5) FFL is a "fraudster marketing company"; and (6) FFL is a "fraud IMO."  Mr. Rutstein often uses these statements and similar ones.

60.     On these calls, Mr. Rutstein often encourages Agents to leave FFL and associate with NAAIP instead.  His talking points and alleged reasoning for encouraging an Agent to leave FFL are all based on false statements and misinformation that he knows is untrue.

61.     Defendants also attempt to poach FFL Agents through direct solicitation.  For example, in February 2022, Mr. Rutstein, under the alias "David Gordon," began to directly email and message FFL Agents lies about FFL and encouraged them to work with NAAIP instead.

62.     By way of example only, in February and March 2022, Mr. Rutstein emailed a number of FFL Agents including Meighan Adams, Laban Matthew Spalding, and Kevin Goodnight claiming that FFL was a "white-collar con job."[14]  In these emails, Mr. Rutstein repeated many of the falsehoods contained in his and Defendants' videos and social media posts.

---

[14] Bell Decl. ¶ 9; Ex. F (email to M. Adams, L. Matthew Spalding, and K. Goodnight).

He also pitched NAAIP and its resources to these Agents, in an attempt to convince them to join his IMO.  Mr. Rutstein promised that working with him would help these Agents "[s]tay [i]n [b]usiness."

63.    Mr. Rutstein has sent and continues to send the same or similar emails to multiple FFL Agents.

64.    Mr. Rutstein uses these emails and social media posts and comments to poach FFL Agents.

65.    When Agents defect from FFL to join NAAIP, Mr. Rutstein encourages them to persuade consumers to cancel their existing insurance policies in favor of his preferred carriers. Mr. Rutstein has specifically targeted Americo, encouraging Agents to switch Americo policies for his preferred policies. The majority of policies issued by most FFL Agents are Americo policies. Agents who act on Mr. Rutstein's advice cause a chargeback on the Americo side and the issuance of a new policy to a consumer results in the contestability period starting over, which harms FFL, its Agents and the underlying policy holder.

66.    From January 2022 through today, Mr. Rutstein and "Mindy Rutstein" made multiple social media posts and comments spreading falsehoods about FFL.  These falsehoods were then disseminated by NAAIP's and "Mindy's" social media accounts on these and other social media platforms.[15]  Some of the posts targeted Agents specifically through social media groups dedicated to them such as the Insurance Forum.

---

[15]    Dkt.    No.    4,    Bell    Decl.    ¶ 10;    Ex.    G    (collective    statements) (https://www.facebook.com/naaip.org; https://twitter.com/naaipagents).

67.     Defendants contend that "Mindy" is a former FFL Agent (which is not true) but is now dedicated to being an "FFL Killer" and "assist[s] [d]efrauded agents" at FFL to "[a]ttain [l]egal remedies."[16]

68.     By way of example only, these false statements include that (1) FFL "preys on new agents to sell them recycled leads"; (2) "Approximately 1/3 of www.naaip.org new agents come from FFL [and] most are failing.  It is disgusting how much FFL lies in their recruiting"; (3) "FFL is a criminal organization"; (4)   "FFL are fraudsters…plain and simple"; (5) FFL has "been defrauding new insurance agents for years; (6) FFL "hires social media writers" to spread false information;  (7) FFL "hurts tens of thousands of agents and tens of thousands of families;" (8) FFL "blasts the internet with blatant lies;" (9) FFL "pushes agents to sell the absolutely worst deal in the industry" and (10) FFL and its Agents commit elder abuse.[17]

69.     These false statements represent only a small portion of the false statements that Mr. Rutstein and "Mindy" have posted on a variety of social media platforms in the last few months.

70.     None of the statements in Paragraph 68 are true.

71.     Through various social media accounts, "Mindy Rutstein" has also encouraged people to sue FFL for fraud, explaining that she "has been in consultation with class action attorneys that cannot believe how easy this case is"; this is a "slam dunk case"; and, in fact, lawsuits are already "starting."[18]

---

[16] Dkt. No. 4, Bell Decl., Ex. E (Mindy LinkedIn bio); Ex. G (collective statements).

[17]     Dkt.    No.    4,    Bell    Decl.;    Ex.    G    (collective    statements) (https://www.facebook.com/groups/349604499193866/).

[18]     Dkt.    No.    4,    Bell    Decl.;    Ex.    G    (collective    statements) (https://www.facebook.com/groups/246959460995/user/100046072960854/).

72.     Mr. Rutstein has spread similar lies on his daily video call and in emails to Agents.

73.     No lawsuit has been filed against FFL for fraud nor has any government entity found that FFL has committed fraud.

74.     NAAIP also engages in unfair and deceptive practices by listing fake reviews of people who purport to work with it.  On information and belief, these reviews are not real, and were authored by one of the Defendants.

75.     Mr. Rutstein has only escalated his campaign of harassment since this Court's last hearing on March 2, 2022.  Over the past week, Mr. Rutstein has sent direct threats to FFL's executives if they do not drop this lawsuit and has accused them and other FFL Agents of committing "elder fraud," while threatening that they could go to jail for four years if they continue to work with FFL.

76.     For example, on March 5, 2022, Mr. Rutstein harassed and threatened FFL Agent Andrew Taylor via phone call and text message.  During his phone call to Mr. Taylor, Mr. Rutstein identified himself as "David Gordon from NAAIP."  He went on to explain that he understood Mr. Taylor to be FFL President Shawn Meaike's "righthand man," and stated that "if you go forward with the lawsuit … we are going to destroy you."

77.     On the same call, Mr. Rutstein accused Mr. Taylor of "elder abuse" and stated that he would "get four years in jail."  Mr. Rutstein then reiterated his threat: "If you go forward, I will destroy it and you need to know that."

78.     Immediately after the above phone call, Mr. Taylor received two text messages from Mr. Rutstein.  The first stated: "The attorney did not pick up the phone and it is your life and it is Shawn's life. David from www.naaip.org."  The second stated: "Attorneys traditionally get excited about billable hours."

15

79.     On the same day, "Mindy Rutstein" sent threatening messages on LinkedIn to many FFL Agents.  These messages stated the following: "…If I have to waste my effort defending myself, it aint [sic] good for me or you.  Key words are elder abuse, churning, bounty or integrity leads, I suggest you become friends with me. Elder abuse is multiple years in jail.  We were told you are high up at FFL.  You will be able to hear the audio recording at trial…."

**D.     These Unfair and Deceptive Tactics Have Caused Harm to FFL and Will Continue to Cause Harm Unless Stopped**

80.     Numerous industry professionals—including FFL Agents, Agents from other IMOs, insurance carriers and potential future Agents—have seen or heard Defendants' false statements and disparagement.

81.     Numerous FFL Agents have been harassed and threatened by Defendants as detailed in ¶¶ 75–79.  The harassment and threats intimidate FFL Agents.

82.     The campaign of harassment detailed in ¶¶ 58–79 harms FFL's business. Defendants have and continue to paint FFL to be a "criminal organization," and "fraudsters," damaging its reputation in the eyes of insurance carriers, current Agents, potential new Agents, and other industry professionals.

83.     FFL and its Agents have had to defend themselves from Defendants' lies and routinely must explain to other Agents, recruits, and insurance carriers that Defendants' statements are false and malicious.

84.     On information and belief, many of Defendants lies have caused FFL Agents to leave the Company altogether or to pursue support at other IMOs at the expense of FFL.

85.     Over 350% more Agents than usual left FFL between the start of Mr. Rutstein's campaign in January until now than who left FFL during this same time period last year.  Between

January 4, 2021 and February 23, 2021, 34 Agents self-terminated from FFL.  Between January 4, 2022 and February 23, 2022, 122 Agents self-terminated from FFL.

86.     Other Agents have, understandably, many questions for FFL after receiving Defendants' messages. Responding to these inquiries has cost FFL time and resources. For example, executives and staff have spent numerous hours responding to these inquires.

87.     On information and belief, many of Defendants' lies have also discouraged new Agents or potential recruits from affiliating with FFL.

88.     FFL has seen a substantial increase in chargeback debt of which it is the ultimate guarantor.

89.     FFL has also lost money and resources as a direct result of Defendants' harassment campaign because it has had to spend time and money (1) hiring lawyers to respond and (2) setting the record straight.

90.     Defendants will not stop unless this Court stops them.  On February 7, 2021, undersigned counsel for FFL sent Mr. Rutstein a cease-and-desist letter.  In one of his recent daily video calls, Mr. Rutstein announced that he had no intention of ceasing and desisting and continued to disparage FFL in that same call.  And since this Court denied the TRO without prejudice, Mr. Rutstein has only escalated his campaign to include explicit death threats.

## COUNT I
### Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)

91.     FFL incorporates and realleges ¶¶ 1 through 90 above as if fully set forth herein.

92.     The Lanham Act prohibits in interstate commerce the use of false and misleading statements of fact in commercial advertisements or promotion that deceive or are likely to deceive in a material way and have caused or are likely to cause competitive or commercial injury to the plaintiff.  15 U.S.C. § 1125(a)(1)(B).

17

93.     Defendants have made false and misleading statements of fact in videos, in social media posts, and in emails, against FFL while promoting their services.

94.     Defendants' statements deceive and are likely to deceive current and potential FFL Agents into believing that FFL is not a place they should affiliate with and that NAAIP is a place they should affiliate with.

95.     Defendants do not inform potential Agents that they are not permitted to act as an IMO.

96.     Defendants do not inform potential Agents that they are engaged in illegal activities.

97.     Defendants' statements have caused and are likely to cause competitive and commercial injury to FFL.

98.     On information and belief, Defendants' affirmative statements and failures to disclose the truth about their unlawful business discouraged potential Agents from joining FFL and encouraged current FFL Agents to defect away from FFL to FFL's financial detriment.  Defendants' false statements against FFL have diminished FFL's brand and reputation.

99.     Defendants' unlawful actions have harmed and continue to harm FFL.

**COUNT II**
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),**
**§§ 501.203(8), 501.204(1), Fla. Stat.**

100.    FFL incorporates and realleges ¶¶ 1 through 99 above as if fully set forth herein.

101.    FDUTPA forbids "unfair or deceptive acts or practices in the conduct of any trade or commerce."  §§ 501.203(8), 501.204(1), Fla. Stat.

102.    Defendants' unfair and deceptive practices are designed to solicit new business for NAAIP's illegally operated IMO from current and prospective FFL Agents.  § 501.203(8), Fla. Stat. (defining "trade or commerce" as "soliciting").

103.    Defendants' unfair and deceptive practices are likely to and have misled current and potential FFL Agents into believing that FFL's business practices are criminal and fraudulent, and that NAAIP's business practices are ethical and compliant.

104.    On information and belief, Defendants' deceptive and unfair practices have caused current FFL Agents to join NAAIP and/or end their business affiliation with FFL.

105.    To counteract Defendants' misinformation campaign, FFL has paid for legal representation and has spent resources on setting the record straight.

106.    Defendants' unlawful actions have harmed and continue to harm FFL.

## COUNT III
## Common law unfair competition

107.    FFL incorporates and realleges ¶¶ 1 through 106 above as if fully set forth herein.

108.    Florida's common law of unfair competition is an umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.

109.    Demonstrated by their repeated attempts to poach FFL Agents, Mr. Rutstein and NAAIP compete with FFL for the same new IMO Agents.

110.    Defendants' deceptive and unfair practices are contrary to honest practices in commercial matters.  Mr. Rutstein lacks a license to participate in the insurance industry and is permanently barred from participating in it.

111.    Defendants' fake reviews and disparagement against FFL are also contrary to honest practices in commercial matters.

112.    Defendants' unlawful actions have harmed and continue to harm FFL.

**COUNT IV**
**Tortious interference with business relationships**

113.    FFL incorporates and realleges ¶¶ 1 through 112 above as if fully set forth herein.

114.    Florida law forbids tortious interference with prospective and current business relationships.

115.    A business relationship forms every time an Agent works with FFL, either through relying on it to purchase leads through third-party vendors and/or to contract with a carrier on the Agent's behalf.  Defendants, having been in the insurance industry for decades, knew about these business relationships.

116.    Defendants purposefully and unjustly disrupted or interfered with these relationships through their deceptive and unfair practices.  By way of example only, Defendants intentionally and unjustifiably interfered with FFL's relationship with numerous Agents by sending misleading and false messages to them in an attempt to recruit them away from FFL to NAAIP.

117.    As a direct result of the disruption, FFL was damaged.  Defendants' deceptive and unfair practices have injured FFL by depriving FFL Agents of time spent working on their business and recruiting new Agents, resulting in lost profits to FFL.

118.    Defendants' deceptive and unfair practices have resulted in Agents terminating their relationship with FFL.

119.    Defendants' deceptive and unfair practices have resulted in an increase in chargeback debt for which FFL is ultimately responsible.

120.    Likewise, because of these practices, FFL has been forced to spend money on remediation including on defending itself against Defendants' lies.

## COUNT V
### Libel per se and Defamation

121.    FFL incorporates and realleges ¶¶ 1 through 120 above as if fully set forth herein.

122.    Under Florida law, libel per se forbids publishing false information about a company if it tends to injure a company in its trade or profession or charges that a person has committed an infamous crime.

123.    Florida also recognizes the common law tort of defamation, which forbids publishing false statements as well.

124.    The false statements discussed in ¶¶ 62, 68 constitute libel per se because they were published on public social media platforms and in emails, contained false information, and tend to injure FFL in the insurance industry and charged FFL and its Agents with an infamous crime.

125.    The false statements also constitute defamation because they falsely disparage FFL's business and ethics.

126.    On information and belief, Defendants intended to spread falsehoods about FFL, or at the very least, were negligent to the possibility that their statements were false.

127.    On information and belief, Defendants intend to divert Agents from FFL to NAAIP.

128.    The false statements have undermined FFL's ability to recruit, train, and support current and future Agents.

129.    The false statements have caused and will cause FFL to lose business.  The false statements have caused FFL Agents to leave the company and prevented new Agents from joining FFL.

## COUNT VI
### Civil Conspiracy

130.    FFL incorporates and realleges ¶¶ 1 through 129 above as if fully set forth herein.

131.     A civil conspiracy, in Florida, involves the following elements: (a) a conspiracy between two or more parties; (b) to do an unlawful act or to do a lawful act by unlawful means; (c) the doing of some overt act in pursuance of the conspiracy; and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy.

132.     Defendants have conspired to violate Florida law and the Consent Order.  On information and belief, Mr. Savage has entered into contracts with insurance carriers on behalf of the Agents Mr. Rutstein recruits, acts as the Agent's upline to receive override commissions, and then provides a kickback (at times 30% of the commission) to Mr. Rutstein.

133.     This scheme violates the Consent Order, which directly or indirectly bars Mr. Rutstein from participating in the insurance business.

134.     This scheme also violates Florida law because Mr. Rutstein is not licensed as an insurance agent or an insurance customer representative. § 626.112, Fla. Stat.

135.     This scheme has caused damage to Plaintiff because it is losing and will lose carrier contracts to Defendants who only receive these carrier contracts through illegal means.

## REQUEST FOR RELIEF

FFL respectfully requests that the Court enter judgment in its favor and grant the following relief:

1. An order enjoining the Defendants from making any and all false and defamatory statements about FFL, whether directly or indirectly;

2. An order requiring Defendants to permanently delete any and all comments, posts, videos, and media that falsely disparage FFL, whether directly or indirectly;

3. An order enjoining the Defendants from sending false and defamatory emails, messages or other communications to insurance Agents;

4. An order enjoining Defendants from harassing and/or threatening FFL and its employees, Agents, and independent contractors;

5. An order enjoining Defendants from soliciting Plaintiff's Agents; and from entering into a business relationship with Plaintiff's Agents including, but not limited to, serving as an IMO or upline for any of Plaintiff's Agents or contracting in any way with Plaintiff's Agents to be listed in or considered part of Defendants' "downline";

6. An order awarding FFL actual, punitive, and compensatory damages, as well as reasonable costs and attorney's fees; and

7. Any other relief the Court deems just and equitable.

Date: March 9, 2022

Respectfully submitted,

*/s/ Drew T. Bell*
Drew T. Bell
Florida Bar No.
E-mail: @kslaw.com
KING & SPALDING LLP

*Attorney for Plaintiff Family First Life, LLC*